Filed 5/30/13  P. v. Cox CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055427 |
| v. | (Super.Ct.No. FBA1000293) |
| JIMMY JOE COX, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  R. Glenn Yabuno, Judge.  Affirmed.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Jimmy Joe Cox, of second degree murder (Pen. Code, §187, subd. (a)).  He was sentenced to prison for 15 years to life and appeals, claiming

that his trial counsel was ineffective and his motion to dismiss should have been granted.[1]

We reject his contentions and affirm.

FACTS

The victim was defendant's live-in girlfriend. By the time of the victim's death in December 1982, they had been involved with each other for three years. They lived in Needles, a town where "everybody . . . knows everybody."

On December 24, 1982, the victim's left hand was found in a plastic bag on the shore of the Colorado River. On January 23, 1983, the victim's head was found inside two plastic bags, floating in the Colorado River.

*Prior Incident*

A woman testified that in May 1981, she saw defendant and the victim arguing in a driveway next to a car whose front windshield appeared to have just been broken by a trash can. The woman heard the male voice say, "If you want me to move my fucking stuff out of here," then the female voice said something, then the male voice said, "I will get all my shit and leave[.]" The woman saw defendant take a lit road flare and poke and stab at the victim with it, while the victim defensively tried to fight defendant off. Defendant then chased the victim with the lit flare, and hit her with it. The victim ran to a nearby house. The woman told police at the time that the victim pounded on the door

---

[1] Defendant filed a petition for writ of habeas corpus on November 16, 2012 (Case No. E057511) which we ordered considered with this appeal. We will resolve that petition by separate order.

of that house, yelling for help.[2]  On the day the woman had been subpoenaed to come to court to testify about this incident, she was too sick to come.  The same day, someone identifying themselves by the defendant's first name called her, thanked her and said it was good she did not show up that day to testify, that she made the right decision "playing" sick, then hung up.

On January 5, 1983, defendant offered a very different version of this incident to a Needles Police Department detective.  Defendant said that he found the victim out with another man, so he chased her down the street with a railroad flare "to scare the shit out of her."  He went on to say that the "slag" from the flare "was slung while [he] was running" and it went through the back of her shirt and burned her, but he did not mean to burn her.

A Needles Police Department officer who responded to the call concerning this incident testified that the victim had burns on both sides of the back torso of her body and to the back of her neck.[3]  The officer testified that when sulfur drips off a burning flare, it burns in an irregular shape, however, the victim's wounds were perfectly round, like the flare, itself, suggesting that defendant had touched the victim with the flare.  Before this officer obtained an arrest warrant, he called defendant, but the latter refused to discuss the victim and said he would not talk to the police if they came to his home.  Defendant

---

[2]  The officer who responded to the call concerning this incident testified at trial that the woman told him that defendant had chased the victim, who ran to a house where she pounded on the door, yelling for help.

[3]  Pictures of these burns were shown to the jury.

asked the officer if the latter had a warrant and when the officer said he did not, defendant hung up on him. A sergeant tried to call defendant, but the line was busy, so officers went to defendant's home after 8:00 p.m. They knocked and announced themselves several times at the bedroom door of defendant's single wide trailer (10 feet by 37 feet) but got no response. Ten minutes after the officers' arrival, and following their threat that they were going to force the door open, defendant emerged from the trailer and was arrested.

In May 2010, defendant offered another version of this incident to a San Bernardino County Sheriff detective. He said that the victim had been drinking and they argued and she had gone to her friend's house in her car. He went to the friend's house to retrieve the keys to the car so the victim would not drive drunk. The victim began to show off in front of her friends, and refused to give him the keys to her car, so defendant got the flare, lit it and began chasing her around the yard with it. Slag from the flare splashed onto the victim's back and legs and burned her. He claimed he was trying to scare her so she would give him the keys to her car. When confronted with his contradictory 1983 statement, as summarized above, defendant did not deny making this statement, but conceded that if the report said he said it, he must have. He offered no further explanation for the discrepancy between the two stories.

*The Disappearance of the Victim*

A long-time friend of defendant's testified that on December 22, 1982, on which day the power had gone out in Needles, he ran into defendant and the victim at the Sun Downer Bar, across the state line from Needles.

4

Another man testified that on December 22, 1982, at closing time, around 1:00 a.m., he and his cousin came out of the Sun Downer and saw a woman who was looking in the parking lot for a ring. She was staggering, upset and crying. In 2009 or 2010, this man was shown a photo lineup containing the victim's photo and he picked it out as looking familiar—at trial, he testified that it was the woman he had seen in the parking lot.[4] He told the detective in 1983 that he thought she was looped because she was crying over a ring and he told the case agent in 2010 that she could have been drunk because she staggered, slurred her words and was bawling. He appeared to testify at trial that she was doing all three things. The man testified that a male inside a small station wagon[5] with tinted windows, which he identified as defendant's vehicle, was mad and was yelling at the victim concerning a ring. In a high pitched voice, perhaps slurring his words, the male called her a bitch and told her he would whip her ass if she had lost the ring.[6] The victim told the man that the male inside the car was going to hurt her if she

---

[4] The case agent testified that the man said the lady looked familiar from the night in the parking lot.

[5] The witness testified that he could have told the Needles Police Department detective (see text following fn. 2, *ante*, p. 3) in 2009 or 2010 that he couldn't tell what color the station wagon was but he said it could have been red or brown. He testified at trial that he saw the vehicle several times around Needles and he reported two sightings of it to the police.

[6] He made the same statement to the case agent in 2009.

didn't find the ring.[7] The last thing the male inside the car said was, "Hey, bitch, forget the ring, it's over[.]"

This man's cousin testified that he and the man helped the woman, who was in her mid-20s and a little bit drunk, look for a ring outside the Sun Downer.[8] She was very upset and said that her boyfriend was going to be very mad at her if she did not find it— that he would beat her ass if she did not find it.

Defendant's long time friend testified that defendant told him on December 29th or 30th, 1982 or on January 1, 1983 that the victim had left behind her car, purse and last paycheck when she disappeared.

The manager of a bank where the victim kept a safe deposit box testified that the Monday after Christmas, defendant told her that the victim was missing, probably due to a fight, or maybe the victim was mad at defendant.

A Mojave Valley Sheriff's deputy testified that on January 1, 1983, defendant told him that the victim had a tendency, when drunk, to run away and disappear for a few days. Defendant said that this had happened twice in the last two months.

A Needles Police Department detective testified that during an interview with defendant on January 5, 1983, defendant said he last saw the victim the night the electricity went off in Needles, which he variously said was the Wednesday prior to

---

[7] He made the same statement to the case agent in 2009.

[8] The cousin testified that he told the case agent in 2010 that this happened during the summer, around 6:00 or 7:00 p.m.

6

Christmas[9] or Thursday, December 23. Defendant said the victim was "fallin down drunk" within thirty minutes of their arrival at the Sun Downer in his red station wagon, having taken one or two straight shots of liqueur with every screwdriver she consumed.[10] He took her home between 7:00 and 9:00 p.m. and assumed she would sleep until their alarm went off the next morning at 5:00 a.m. He stated variously that he undressed her and put her into bed and she lay down on the floor and went to sleep, after she walked into their trailer. When he awoke, she was gone, and so was her purse. He claimed variously that he sought the victim out by going to her place of employment and he contacted his sister who also worked there and told him the victim had not been to work. He also went to the home of the victim's best friend, looking for her. In response to the question when he first notified the police of the victim's disappearance, defendant said, " . . . I don't know how long it's been . . . and she's run away before. We've had . . . disagreements and she's r[u]n away, she's hitchhiked, she's . . . gone off with other men. . . . [S]he was not the most faithful moral person in the world . . . ." He said she had gone off four to six times before, but he usually found her at her best friend's house, sleeping on the floor. On one of these occasions, about six months previously, however, the victim came home and told defendant that she had been with another man. Defendant cited the victim's unfaithfulness as the reason for the May 1981 flare incident. Defendant variously stated that he believed the victim had run off with another man and

---

[9] That was December 22, 1982.

[10] Defendant also claimed they had gone to another bar first, where they had two or three drinks.

7

she had gone to New York to be with her parents for Christmas because defendant refused to go there with her.

A San Bernardino County Sheriff's detective testified that defendant told him in May 2010 that the electricity had gone off in Needles the night the victim disappeared, so they had gone to the Sun Downer across the river at 4:00 or 5:00 p.m. They had a couple of drinks over the period of a couple of hours, left and returned to Needles, where the lights were then back on. They went to bed and when he awoke the next morning at 6:00 or 7:00 a.m., she was gone.[11] Defendant either went to the home of the victim's friend or he called the friend, but the victim was not there. Defendant said it was not like the victim to just walk off. While they had separated earlier for a month, during which she may have had a relationship with someone else, other than that, she was "devoted to him," they were together and it was not like her to take off. Defendant denied that the victim had had any relationships in Needles with other men, other than the man she dated before she began dating defendant. When asked if there had been physical confrontations between defendant and the victim, defendant said there had not been (evidently, forgetting the road flare incident in May 1981) and while they had their problems, there was nothing major. He also said that due to the fact that the victim had been sexually assaulted previously, she was very careful about with whom she got in a car and would not have gotten in a car with a stranger. A week later, he reported her missing to the

---

[11] The detective testified that defendant acknowledged the discrepancies in the times between this interview and the one that occurred in 1983, but defendant explained that his perspective as far as the times during the earlier one was off.

Mojave Valley Sheriff's Office in Bullhead City and to the Needles Police Department the following day. Defendant said nothing unusual happened the day before the victim disappeared and he and the victim had not argued that day. He denied that the incident outside the Sun Downer, described above, had happened. He said that the victim did not have a ring and he had not given her a ring "he th[ought]." He denied that they ever screamed at each other, although when confronted about the May 1981 road flare incident, he conceded that she had screamed at him during it and he probably yelled at her. Defendant said that when the victim disappeared, her car was at his home, but the keys were gone. He was uncertain if her purse was gone, because she had so many. After reading about the discovery of the hand in the Mojave Valley Newspaper, he had gone to the (presumably, San Bernardino County) sheriff's office to give more information about the victim. He claimed he had previously reported her missing. He said that when he got there, he was arrested for murder. When asked why he delayed reporting the victim missing, defendant said he thought she had gone for just a day or two and would show up or call. He said the victim had a history of hitchhiking and moving around. However, she would not leave him for several days—she was a homebody and stayed at home. She had never left when they were together for longer than overnight. He said he could not exclude anyone as her murderer, which the detective took as an unusual statement because most people attempt to exclude themselves. When asked about the fact that the victim had been dismembered, defendant said he did not know why anyone would do that "after she was shot" and someone must have hated the victim to "put a bullet in her[,]" although he asserted that she had no enemies. The detective felt

9

that defendant's statement was unusual, as law enforcement had no idea how the victim had been killed. Defendant also said that it made no sense to him that if someone raped the victim, they would have to kill her. He asserted that whoever dismembered the victim was not trying to hide her identity or they would not have wrapped her hand and head in plastic and put them in the river, where they would float. He felt someone was trying to shock someone. Defendant was asked about a letter he had written to the victim's parents in February, 1983, in which he said, " . . . in spite of her faults[, the victim] was, and still is number 1 with me. [She] could never do anything so bad that I wouldn't forgive her, [and] she knew it. She could have c[o]me home any time the 22nd or 23[r]d [and] told me any kind of story or excuse [and] she would be alive today."[12] Defendant said this was his way of telling the victim's parents how he felt about her disappearance. Although he initially denied that one could get to the Colorado River on Five Mile Road, he eventually admitted that one could, but it would be going out of one's way. The case agent testified that the river could be reached via Five Mile Road.

The victim's mother, who testified that she did not believe anything defendant told her and she was "pretty sure [defendant] had killed" the victim, also testified that she received a letter dated December 30, and mailed December 31, from defendant. In the letter, defendant said he was enclosing a copy of a poem the victim had "left for him when she left." He said he knew the victim did not write the poem the night before she

---

[12] During cross-examination of the detective, defense counsel asked him whether this referred to the victim "run[ning] off with somebody" and the detective responded that it did.

10

disappeared, as she was "too drunk[.]"  He went on, "So, I guess she had planned this move ahead of time.  Apparently she had someone pick her up . . . ."  He said if the victim was not with her mother or older sister, he thought she might be in Nevada working as a prostitute, which she had discussed with him previously.  Defendant then described what he said was "the main trouble with" the victim and him, i.e., that he loved her too much and "when she began to stay out all night, [he] would always lets her come home and accept her lame excuses for being gone, even though . . . [he] knew better."  He continued, "then she began to stay out 2 or 3 nights until the spring of this year when she stayed two weeks."  He complained that she had lost all respect for him and he felt like such a fool as he "worshiped the ground that [she] walked on."  Defendant reported that the victim's best friend had told him that the victim was interested in a "'blonde mailman.'"  He encouraged the victim's mother to contact the victim's best friend in the hope that she would tell the mother what she knew about the victim's disappearance, so the mother could tell defendant.  He closed, saying if he did not hear from her or the victim's sister soon, he was going to go to the police and "turn [the victim] in missing."  In the poem, a copy of which defendant had enclosed in the letter, the victim said that whoever the poem is written to does not listen to her, does not value the victim's thoughts and opinions, that she and this person disagree with one another and they do not communicate, that "all the joy has turned to pain," that things cannot remain as they are, that the person is making her feel insignificant and the person is "fading out of view."  It concludes, "And now it seems it's all been said[,] I must leave so I'll go ahead."  The mother testified that she vaguely recalled telling the Mojave Valley County Sheriff's

11

detective in 1983 that defendant told her after the victim had disappeared that the victim was going to leave him. She testified that she told the detective everything she knew at that time, that the events were fresher in her mind then than they were now and she had no reason to lie to him. She could not recall telling the detective, but she was sure it was true that defendant told her that the victim said she had come to Needles with a backpack and she could leave the same way and they fought over the victim's drinking. Defendant told the victim's mother that the victim also used every drug she could get her hands on. The mother testified that she had no reason to believe that defendant did not tell her all the bad things the victim had done, but that he loved the victim too much to kick her out. She testified that defendant told her that the victim could do anything and he would forgive her and she had left him before. Defendant threatened to kill himself if the hand found on December 24 belonged to the victim. However, he said in a letter to the mother, written after it was discovered that it was the victim's hand, that he could not kill himself because his mother would have a heart attack and his sister would commit suicide. Defendant told the mother that the victim told him that if defendant ever hit the victim, she would wait until he was asleep and hit him with a frying pan. During a phone conversation, the mother asked defendant if he had killed the victim. After a seven-to-eight second silence, defendant responded, "[The victim] was no good, you know that, don't you, just like [her older sister]." The mother said that before Christmas, 1982, she had asked the victim to come home to New York State for the holidays, and offered to send her the fare, but the victim said she could not and was sad and very depressed.

12

*The Aftermath*

A witness, who knew defendant, testified that probably 9:00 a.m. on December 24, 1982, he was driving north on Highway 95, between Five Mile Road and the Needles dump and saw defendant standing next to a small red station wagon, similar to defendant's, parked on the side of the road. He waived to defendant and defendant acknowledged him.

On December 24, 1982, a left hand, which was identified as the victim's on January 5, 1983, was found in a tan plastic bag 12 inches from the shore of the Colorado River. The bag had been closed at the top with black baling wire. The cuts to the bone of the hand were consistent with those that could have been caused by a saw-type instrument. News of the discovery of the hand first appeared in the Kingman, Arizona paper on December 30, 1982 and then, the following day, in the Mojave Valley News.

Defendant's next-door neighbor testified that early on a Sunday or a Wednesday, three-to-five days before he heard that the victim was missing, he saw defendant scrubbing the inside of the victim's car with a brush and soapy water and rinsing it out with a garden hose. He had never seen defendant do anything like this before.

Another neighbor testified that in 1983, he told the police that during the school Christmas break in 1982, he saw what he thought was defendant[13] vigorously scrubbing the back of defendant's red station wagon, behind the back seats, with a bucket and a

---

[13] He testified he had not see defendant before this, although he had been his neighbor for eighteen months.

gallon container of something. He testified he had never seen defendant clean any cars before[14] and did not see him clean the outside of this vehicle. He also testified that both before and after this, he heard the sound of a saw coming from the direction of defendant's home. He testified that after the car washing incident, he did not ever see again the woman he had been seeing at defendant's home.

The victim's mother testified that defendant first notified her of the victim's disappearance by letter which she received in New York State before December 25, 1982. However, defendant had never notified the mother on prior occasions when the victim had left him.

The bank manager,[15] who had known defendant most of her life, testified that on the Monday after Christmas, 1982,[16] ten to fourteen days before the newspaper article about the discovery of the hand, and within a few days of the victim being gone, defendant came into her bank and asked if the victim had been in and had done anything concerning her safe deposit box. Defendant explained that the victim was missing and if she had left him, he believed she would have cleaned out her safe deposit box before leaving town. As stated before, he said her disappearance was probably due to a fight, or she was mad at him and she would show up. When the manager told defendant that the victim had not been in recently, he began to cry. Defendant said he contacted the

---

[14] See footnote 13, *ante*, page 13.

[15] See text at page six, *ante*.

[16] That would have been December 27.

14

Needles Police Department to report the victim missing, but it would not take his report. When the manager complained to a friend at the police department about its refusal to take a missing person report, the friend told her that it was because the disappearance was probably due to a fight.

Defendant's long time friend testified that he had been arrested for driving while under the influence at 1:00 a.m. on December 24 and had remained in jail until December 28.[17] In January 1983, he told a Mojave County Sheriff's detective that either on December 29 or 30 or January 1, he had a second conversation with defendant at the Sun Downer.[18] The friend reported to the detective that defendant was upset and claimed he had been questioned by police for six-to-eight hours about the disappearance of the victim.[19] The friend further reported that defendant told him that the victim had gone off with somebody, but she had not taken her car, her purse or her last paycheck and defendant had not reported her missing.[20] The friend testified that after this conversation

---

[17] The detective (see text following fn. 17, *ante*, p. 16) testified that the friend was released from jail on December 28.

[18] The detective testified to the same thing. The friend testified that he left Needles, where he was vacationing, and returned to his home in Wyoming on or about January 3, 1983. Therefore, the conversation between defendant and his friend had to have occurred before this.

[19] The detective testified to the same thing. In his interview with the San Bernardino County sheriff's detective in May 2010, defendant said that in late December 1982, he told his friend that defendant was suspected of murdering the victim.

[20] The detective testified to the same thing.

with the detective, defendant called him and asked him if the police had spoken to him.[21] The friend said they had and defendant asked him what had been said.[22] The friend told defendant that he told the police the truth about being at the Sun Downer with defendant, but he did not want to know anything or be involved.

Despite what defendant had told his friend, as already stated, he told the Needles Police Department detective in January that the victim had left with her purse, which he described. Also, the Mojave County Sheriff's detective testified that no one from the Needles Police Department or his office had questioned defendant before December 29th or 30th.

On January 5, 1983, defendant told the Needles Police Department detective that a friend of his who lived on the Arizona side of the Colorado River called him on January 1st about the Mojave Valley Newspaper article concerning the hand, and confirmed from defendant that the victim was missing. Defendant told the police that he immediately bought a copy of the paper, went to the Needles Police Department, where a deputy sheriff made a copy of the article, then to the Sheriff's Office in Bullhead City, Arizona, at the deputy's suggestion. There, defendant was asked about any notes the victim may have written and he handed over the original of the afore-mentioned poem by the victim which defendant said he had discovered about two days after she had disappeared and

---

[21] The detective testified that the friend told him the same thing during a March 29, 1983 phone interview.

[22] See footnote 20, *ante,* page 15.

which defendant had in his wallet.[23]  He told the police that he had returned to the sheriff's office four times before January 5, and each time, he talked to a different person who seemed to know nothing about defendant having been there before.  Defendant told the police that he had been all over town "for two weeks," talking to neighbors and employees of bars, casinos and restaurants, asking about the victim.  He also claimed that "it took two weeks for any law enforcement agency to ask anybody any questions[,]" implying that he had informed law enforcement two weeks previously and he complained that nothing had been done to find the victim in the interim.[24]  Despite this, a lieutenant who was participating in the interview asserted that he had talked to "damn near everybody" at the Mojave County Sheriff's Office and "everybody says they never talked to" defendant.

Defendant's friend, who lived in Mojave Valley, Arizona, remembered his interaction with defendant differently.  He testified that he read the Mojave Valley News

---

[23]  Defendant told the Needles Police Department detective that the victim "left me a note," meaning the poem.

[24]  We note the conflict between this claim and defendant's statement to the victim's mother in his letter dated December 30, 1982, that if he did not hear back from the mother or the victim's older sister, he would then contact the police and report the victim missing.  (See text p. 12, *ante*.)  We also note the conflict between this claim and defendant's failure on January 1, 1983 to tell his Arizona friend after the latter told defendant to report the victim missing to police, that he already had.  (See text following fn. 23, *post*, p. 19.)  Finally, we note the conflict between this and defendant's statement to his long-time friend on December 29 or 30th or January 1 that he had not reported the victim missing to police.  (See text, *post*, p. 19.)

article about the hand being found, then[25] defendant came to his home and the friend brought up the newspaper article during a casual conversation, at which point defendant told him, in an unconcerned manner, that the victim had been missing for about a week. The friend told defendant that defendant needed to file a missing person report with the police. Defendant did not tell his friend that he had already reported the victim missing. The friend allowed that his conversation with defendant could have occurred after he read an article about the discovery of the victim's head, or after either or both. The friend also testified that either that day or during an earlier occasion, he saw a box for a circular saw in the backseat of the victim's car, which defendant had driven to his house. The case agent, who interviewed the friend, testified that the friend told him that defendant did not show that he was surprised when the friend told him about the discovery of the hand.

The deputy sheriff the defendant referenced during his conversation with the police on January 5[26] testified that on January 1, 1983, defendant brought to the San Bernardino County Sheriff's Office a copy of the Arizona newspaper article about the discovery of the hand. Defendant asked the deputy if the hand could be fingerprinted in order to identify its source and the deputy said if a person had previously been fingerprinted, those prints could be compared to the ones coming from the hand and an identification could be made, however, if there were no pre-existing prints of the person, an identification could not be made. At that point, defendant reported that he had

---

[25] He testified defendant came to his house perhaps two days after he read the article or the same day it appeared in the paper.

[26] See text on page 17.

awakened the morning of December 23, 1982 to find that the victim was missing—that

he last saw her when they went to bed at 9:00 p.m. on December 22. However, defendant

did not tell the deputy that the victim had had her fingerprints taken when she had been

previously arrested in Bakersfield. The deputy told defendant to file a missing person

report with the Needles Police Department, but he, himself, could not take a report

because the victim lived in the city of Needles.[27] Defendant had said that he had not

previously filed such a report, explaining that the victim had left him previously "for

weeks on end." The deputy also referred defendant to the Mojave County Sheriff's

Department in Arizona because it was "the primary agency investigating the incident" as

that was where the hand had been found.

A Mojave County deputy sheriff testified that on January 1, 1983, defendant

reported the victim missing. Defendant reported that he and the victim had been at the

Sun Downer on December 21 and the following day, he discovered that she was gone.

Defendant reported that the victim had become intoxicated at the Sun Downer, so he took

her home at 9:00 p.m. and put her to bed. When asked why he had waited 10 days to

report her missing, defendant explained that she had a tendency, when she became

intoxicated, to run away and disappear for a few days. This had happened, defendant

said, twice in the last two months. The discovery of the hand had catapulted him into

action. He said he had made a report to the Needles Police Department. He gave the

---

[27] In 1983, the sheriff's office, of which this deputy was a member, had jurisdiction over the unincorporated areas of Needles, while the Needles Police Department had jurisdiction over everything within the city.

19

deputy the poem the victim had written. Defendant told the deputy that the victim had been arrested previously in Bakersfield and she had had dental work done in Needles.

On January 5, 1983, defendant was arrested and his home was searched on January 7. It was exceptionally clean. Opened mail addressed to defendant was found on a table, but unopened mail addressed to the victim was found in the trash can. There were a number of stains on the bed sheets, mattress pad and mattress. Stains on all of them tested presumptively for blood. The fitted sheet and mattress cover had stains of Type A blood. If what was on the mattress was blood, it was a significant amount, consistent with a major nose bleed. In his interview with the San Bernardino County sheriff's detective in May 2010, defendant first asserted that the blood was from the victim's period, then that the mattress had come with the mobile home when he purchased it, implying that the mattress had the stain on it when he moved in. Several wrapped Christmas gifts for the victim, most of them from defendant, were found in the shed. A brush hoe was found on an exterior wall of the shed. Traces of human blood, insufficient to type, were found on the blade edge. In the May 2010 interview, defendant denied injuring himself on the brush hoe and he said he did not know how human blood got on it. He appeared startled by the news that human blood had been found on the hoe. A spool of bailing wire was found in the shed, similar in composition and diameter to the baling wire that closed the bags containing the hand and the head. A new-appearing box for a circular saw was found in the back seat of defendant's car. In the above-referenced interview, defendant claimed that the saw box was for a circular saw which he kept in the

20

shed.  Defendant said the police "must have missed it" when they failed to find the circular saw during their search of the shed.

All along both sides of defendant's station wagon were hundreds of fresh scratches, as though the vehicle had been driven through heavy brush.  The Needles Police Department officer testified that in 1982, the river could be reached by driving a car down Five Mile Road, and if the car drove along the river, it would have to go by some brush.  The interior of the car was clean.  Three latex gloves and a box or roll of tan plastic garbage bags consistent in physical characteristics and composition with the outer bag in which the victim's head was later found were in the trunk of the victim's car.  The rear seat of the victim's car had recently been reupholstered.

On January 23, 1983, a tan plastic bag, containing a green plastic bag, containing the victim's head was found floating in the Colorado River near the Arizona side.  Both bags had been closed with baling wire, which was similar to the wire that had closed the bag containing the hand.  A criminalist testified that the baling wire on these bags, on the bag containing the hand, and the spool taken from defendant's shed were similar in elemental composition, size and type and could have all come from the same source.  The victim's head had been severed from the back at its base with an instrument that cut to midway in the jaw, then veered upward, then backed up and re-cut about one-half inch removed.  After a forensic anthropologist was consulted, the investigation centered on a hand-held saw.

On May 12, 2010, defendant's home was searched again and a circular saw, not the same item connected with the box that had been found in defendant's car, was

21

discovered in one of defendant's three sheds. About 20 newspaper articles about this case were found in albums in defendant's bedroom.

At the time of the victim's death, the only two ways of identifying body parts were fingerprints or dental records—DNA was not in use. The cause of death was never established, nor was the type of saw used to dismember the victim. Both the victim and defendant had Type A blood.

The only evidence offered by the defense was the testimony of a woman[28] who said she had been an acquaintance of the victim's for six months before the victim's disappearance[29] and was a good friend of defendant's. She said on December 23, 1982, around 8:00 p.m., the victim, who had been drinking, and a man, who was not defendant, came into the bar where she was a bartender, and picked up a pizza that had been ordered previously.

ISSUES AND DISCUSSION

1. *Ineffective Assistance of Trial Counsel*

In connection with defendant's motion, which was heard after the close of evidence, to dismiss the case against him for failure to charge him in a timely manner, the parties stipulated, for purposes of this hearing only, that, "[A fingerprint examiner at the Arizona Department of Public Safety] is deceased [and] . . . if called . . . would have testified that [in April 1983,] she found a print on a fold on the bag where the head was

---

[28] She admitted that she had been convicted of the felony of selling marijuana in 1983.

[29] She testified she saw the victim only when the victim had come into the bar.

22

found, she compared it with known fingerprints and was unable to make a match, known fingerprints including that of [the Mojave County Sheriff's d]etective . . . and [defendant] . . . ."[30] Defense counsel explained to the trial court that the stipulation would not be presented to the jury because "there would have been an objection as [to] hearsay . . . ."

In the discussion of this issue on the record before us, the parties did not disclose which of the two bags containing the head—the inner or the outer—was at issue. In his moving papers below, defendant asserted, "A partial finger print was found on [this] bag . . . [The fingerprint examiner] . . . has passed away and is not available to testify that it did [not] match [defendant]." Interestingly enough, at the hearing on the motion, defense counsel asserted that defendant was prejudiced by the delay in charging him because if defendant had been charged in a more timely fashion, counsel "would have had the opportunity to have a separate lab look at [the fingerprint] . . . and had an investigator talk to the . . . [examiner] . . . ." Counsel added, " . . . I certainly would have gotten more in to it with [the examiner] had she been alive or available."

In his opening brief, defendant asserts that his trial counsel was incompetent for failing to seek admission of the examiner's report under either the business records exception to the hearsay rule or the public records exception to the hearsay rule. In making this assertion, defendant assumes that there was a report. However, the record

---

[30] In his reply brief, defendant asserts that the print was compared to those of "all of the police officers involved in the investigation who may have come into contact with the bag[.]"

23

before us contains no such report. Additionally, there are no facts in the record before us concerning the circumstances under which such a report, if one existed at all, was prepared. Therefore, there is no basis upon which we may determine the merits of defendant's contention that defense counsel below would have been able to establish a sufficient foundation for admission of such a report under either exception to the hearsay rule.

We note the following additional facts in the record before us concerning this issue: At the preliminary hearing, the detective testified that he spoke with the examiner and she told him that she was able to lift some partial prints off the bag, that he told her that "as far as [he] knew nobody from [the detective's] team had touched the bag in that area[,]"[31] and "she wasn't able to identify the . . . partial latents that she had with any of the prints" he sent to her, including his own, defendant's and those of any other possible suspects and "anybody from [his] team who may have come in contact with th[e]" bag. He added that the print lifted from the bag was partial and he did not know "how identifiable it was." When asked whether he knew if anyone had touched the bag before he took custody of it, he replied, "Other than [the Golden Shores Marina owner],[32] who I believe removed it from the river, and [the Mojave County Sheriff's

[31] See footnote 30, *ante*, page 23 and text immediately before and after footnote 32, *post*.

[32] The detective testified that this man's name was Clifford Phillips. At trial, the witness who testified that he and a companion had pulled the bag out of the river identified Clifford Phillips as the owner of the marina. According to the record before us, the marina owner's prints were not compared to the print on the bag. (See fn. 31, *ante*.)

deputy][33] . . . nobody else touched that bag to the best of my knowledge." However, he went on to say that he did not know if someone touched the bag before the marina owner did, and he added, "the [first] officer that arrived on the scene described numerous footprints around the bag from what he determined was probably a lot of people going down to look at it. So, no, I have no knowledge of . . . who else may have touched the bag." From this testimony, it is clear that the detective was referring to the outer bag in which the head was found.[34]

At the hearing on the motion to dismiss, the case agent testified that on September 28, 2009, the fingerprint on the bag was determined by CAL-ID to be not suitable for comparison. He added that an examiner from CAL-ID told him that, " . . . [T]he prints back then could have been possibly used for comparison, however, the standards of today rule that the fingerprint that was found on the bag is no longer . . . suitable for comparison. [¶] . . . [¶] . . . [I]t couldn't have been compared back then, there [were] not enough suitable ridges to have made a determination. . . . [Y]ou couldn't rule anybody in or out based on that fingerprint. [¶] . . . [¶] . . . [I]t's not a degradation issue, it's just a lack of sufficient ridges to compare."

A witness at trial, who was 12 years old at the time of the crimes, testified that on January 23, 1983, between 3:30 p.m. and 5:00 p.m., he and a friend saw the bag

---

[33] At trial, this deputy testified that he wore black leather gloves while handling the bag.

[34] As part of his next issue, defendant concedes that the bag in question was the outer one.

containing the victim's head floating in the river "up against the brush and rocks" at the Golden Shores Marina. He said both of them grabbed "a side of the bag" and lifted it on to the rocks. They both took off running as soon as they saw the victim's face through the bags. The witness notified his father and the owner of the Marina. The police did not arrive until "about an hour and a half" later. There was no evidence presented below that the area where the bag had been pulled ashore by the boys had been immediately roped off and guarded to prevent anyone from touching the bag. The other young man who was with this witness that day did not testify and the record contains only his name, as testified to by the witness. There is nothing in the record suggesting that the prints of either of these young men were compared by the examiner to the print on the bag.[35]

The Mojave County Sheriff's deputy who first arrived at the Marina testified that he got there around 6:00 or 6:15 p.m. He testified that there were "very few" people around the bag when he arrived, but there were bystanders up above. He added that there were "footprints around [where he was examining the bags] where the people had been there, . . . probably from . . . people just being curious."

Assuming, for the sake of argument only, that there had been a report by the examiner that the defense would have been able to get admitted, the defense had a tremendous "chain of custody" problem with the fingerprint from the moment the bag was manufactured (anyone who came in contact with it could have left their prints on it), in addition to the fact that the boys had handled the bag, as had the marina owner, and the

_____

[35] See footnotes 30 and 31, *ante*, pages 23 and 24.

26

record before us does not disclose that the fingerprints of any of these people had been compared by the examiner to the print on the bag. Trial evidence suggests that others may have touched the bag as well once it was placed on shore. Additionally, the bag had been unaccounted for for about a month, during which time any number of people may have touched it when it washed ashore or while it was floating in the river. Finally, the record suggests a basis for calling the examiner's conclusion into question, i.e., that the ridges were insufficient to permit comparison. In order to prevail on an incompetency of counsel claim, defendant carries a heavy burden of showing that but for the failure of counsel below, there is a reasonable probability that the outcome would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) Given the strength of the case against defendant, as set forth above, the baseless nature of defendant's claim that there was a report by the examiner which he could have gotten introduced into evidence, and the facts that the bag could have been handled by a multitude of others and was, in fact, handled by some and went unsupervised for a month before and hours after its discovery, and the examiner's conclusions may have been faulty, defendant cannot carry his burden.

2. *Denial of Motion to Dismiss*

As already stated, defendant moved, unsuccessfully, at the close of evidence, to have the case against him dismissed for failure to charge him in a timely fashion.

In determining whether there has been a denial of due process resulting from a delay in charging, the defendant must establish prejudice as a result of the delay. (*People v. Reeder* (1984) 152 Cal.App.3d 900, 909.) The burden then shifts to the prosecution to

show justification for the delay. (*Id*. at pp. 909-910.) Then, the trial court balances the prejudice against the justification. (*Id*. at p. 910.) Defendant contends the trial court's ruling denying his motion was an abuse of discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 431.)

As to the fingerprint discussed above, as we have already stated, defense counsel asserted that he was prejudiced by delay because the print found by the examiner on the bag was, by the time defendant was charged, so degraded that the defense could not send the print to another lab to have it re-examined and to have a defense investigator talk to the examiner.[36] Defendant did not assert below how re-examining this print or questioning the examiner could have produced more favorable evidence for him than the examiner's conclusion that neither defendant's prints nor those of any law enforcement officer who may have touched the bag matched the partial print on the bag. The trial court did not expressly address the fingerprint issue in denying the motion to dismiss. However, our previously made comments support our finding that the trial court could not possibly have abused its discretion in impliedly finding that either defendant did not suffer prejudice as to the fingerprint issue due to the delay or that whatever prejudice he did suffer was outweighed by the justification for the delay.

---

**36** Defendant did not ultimately assert below that the absence of the examiner's report from the trial prejudiced him, therefore, we will not address this contention. (He asserted only that the examiner was not available to testify at trial that the partial print did not belong to him.) Whether defense counsel below would have been successful had he sought admission of the report at trial as a business record or public record has nothing whatsoever to do with whether he was prejudiced by the delay in charging him.

28

Next, defendant asserts that the delay resulted in the man, who testified that he had been at the Sun Downer on December 22, 1982 with his cousin, to not be impeached with statements he had made to the Needles Police Department detective that contradicted his trial testimony.[37]

We begin our discussion of this issue by refuting an assertion made by defendant about it. Contrary to defendant's contention, the prosecutor did not argue to the jury that the argument between the victim and the male in the station wagon in the Sun Downer parking lot was "the primary evidence of [defendant's] motive to kill" the victim. It was, rather, as the prosecutor argued, one of *several* pieces of evidence tending to establish defendant's motive to kill the victim.[38]

As defendant correctly asserts, the man testified several times that statements appearing in the transcript of his interview with the detective in 1983 were not accurate.

---

[37] See text on page five, *ante*.

[38] Defendant also misconstrues the testimony of this witness by asserting, " . . . [The man] was able to identify [the victim] out of the six photographs shown to him by [the case agent] in 2010 in part because the photograph of [the victim] was the same one used by [the Needles Police Department d]etective . . . in 1983." Actually, at page 239 of the Reporter's Transcript, the man testified that when he was shown the photo lineup by the case agent in 2010, he identified someone that looked familiar to him. When asked if that was how he identified the picture of the victim at trial as the woman in the parking lot of the Sun Downer, he said, "No. That's who I'm pretty sure it was" in the parking lot. The man was then asked, "So in . . . 2010 this person looked kind of familiar to you, but today . . . you remember that definitely she is the person that was in [the parking lot]?" The man responded, "Yes, it had to be." He was then asked, "And this is the same person or the same picture even that you may have been shown . . . by [the d]etective [in 1983]?" The man replied, "I think so, yes." This does not suggest, as defendant asserts, that his identification of the victim's picture in 2010 was due in any part to the fact that he was shown her picture in 1983.

Those differences centered around four subjects, i.e., whether the ring had been found, whether the victim was drunk, whether he and/or his cousin was/were drunk, and whether the car the male was in was a red station wagon. Defendant here begins with the first topic.

The man denied telling the detective in 1983 that his cousin found the ring. He said that what he probably said was that they probably found it, but he doesn't know whether they did or not—just that *he* did not find it. He denied responding to the detective's question about the woman's appearance after the ring was found and given to her as follows, "Well, she felt a little better." He denied telling the detective that his cousin had found the ring and gave it to the woman. He testified that he told the detective that this could have happened, but he did not know if the woman found it or if his cousin found it or what happened. He denied telling the detective that "we" found the ring and gave it to the woman, who got in the car and took off. He testified that he told the detective that someone could have found the ring. He denied telling the detective that he saw the woman and encountered the male in the car only for three seconds because his cousin happened to look over just as they left the bar and there was the ring and the cousin gave it to the woman, who said thanks. The man testified that, in fact, he searched for the ring for between 30 and 60 minutes.

Defendant here asserts that being able to show that the man had told the detective the matters he denied, as described above, was critical because if the ring had been found, "that effectively eviscerated the prosecution's supposed motive for [defendant] to have committed this killing." As we have already observed, defendant severely over-credits

30

the argument over the lost ring as the reason for defendant killing the victim—the evidence points to *many* more. Additionally, as already stated, this man's cousin testified that he and the man had helped an upset and slightly drunk woman in her mid-twenties look for a ring in the parking lot of the Sun Downer for about 30 to 40 minutes, before the cousin went back into the bar, *not having found the ring*.[39] Also, as already stated, he testified that the young lady said her boyfriend or husband was going to beat her ass if she didn't find the ring.

Next, defendant calls our attention to the conflict in the man's statements about his level of intoxication during the incident. The man denied telling the detective in 1983 that he was "pretty well looped" but he did admit to having a couple of beers and being "a little looped."[40] He also admitted he told the detective that he had been drinking and he may have said he was pretty well looped, but he didn't mean it. We do not view this as an inconsistency worth discussing.

Next, defendant points to the man's testimony about the car in which the male was. He testified that he told the detective in 1983 that he could not say what the car was other than it was small. However, he also testified that it was a station wagon and he told

---

[39] The cousin testified that the man remained outside with the woman and they continued to search, but eventually the man joined him inside the bar.

[40] Defendant misstates the evidence by asserting that the man testified at p. 230 that he was sober. On that page of the transcript, the man testified that he "got a little looped . . . [but] [¶] . . . [¶] [he] wasn't that looped."

the detective that.[41]  He allowed that he could have told the detective that he did not know what color it was, but he did tell him that it could have been red or brown.[42]  He denied telling the detective that he was pretty sure the car was little because the male had to stoop down to get in it.  He denied seeing the male get in the car.

The man testified that he probably did not tell the detective in 1983 that the male in the car said he would whoop the woman's ass if she did not find the ring.  However, as already stated, his cousin testified to the same statement being made.  The man also testified that he did not tell the detective in 1983 that the male said to forget the ring and it was over, however, he explained that he had not been asked about this by the detective.[43]

Finally, we note that the prosecutor offered to stipulate to have the transcript of the interview of the man by the Needles Police Department detective[44] admitted into evidence *and defense counsel turned him down, insisting that he preferred to have the detective, who had died in the early 1990's available for him to question.*

At the time, defense counsel back peddled about the accuracy of the transcript, saying, " . . . I'm not sure if [it] is a verbatim statement of what was taped that day."

---

[41]  If defense counsel had not refused the prosecutor's offer to stipulate to the admission of the transcript of the interview (see text following fn. 43, *post*) he might have been able to impeach the man as to this claim.

[42]  See footnote 41, *ante*.

[43]  See footnote 41, *ante*.

[44]  The tape of the interview had been lost.

However, he pointed out that he "read into the record the statements that are in . . . [the] transcript . . . " Defendant cannot refuse to mitigate whatever prejudice accrued to him as a result of the absence of the detective from trial, while asking us to reverse his convictions due to that absence. Moreover, counsel below was correct—he took every opportunity to read into the record the statements the man had made to the detective in 1983 that contradicted statements he made to the case agent in 2010 and at trial. Given this, we cannot agree that defendant was significantly prejudiced by the absence of the detective from this trial.

Next, defendant asserts that because until Evidence Code section 1109, which permits the admission of evidence of prior domestic violence incidents when the defendant is currently charged with domestic violence, was not law until 1996, the failure to charge him by then prejudiced him. However, defendant is asking us to determine whether the trial court abused its discretion in denying his motion to dismiss for pre-charging delay and he did not assert this point below. Therefore, even if it has merit, we may not utilize it as a reason for concluding that the trial court abused its discretion in denying his motion. (*People v. Homick* (2012) 55 Cal.4th 816, 867; *People v. Riccardi* (2012) 54 Cal.4th 758, 802; *People v. Lightsey* (2012) 54 Cal.4th 668, 713.)

In his last contention, defendant asserts that due to the passage of time, many witnesses had to have their recollections refreshed with statements they had made contemporaneously with the crimes. However, he fails to demonstrate that this resulted in faulty testimony. His assertion that this deprived him of the opportunity to effectively cross-examine these witnesses is meritless—he had a full opportunity and the jury was

33

well aware of the limitations of these witness' testimony. Moreover, as the People correctly point out, the fading memories of these witnesses (and, as we have stated, all the witnesses at trial were prosecution witnesses except for one) proved useful fodder for the defense.

Defendant also points to the fact that the prosecutor asked the sole defense witness how she could remember, 27 years later, that precisely on December 23, 1982, she saw the victim in her bar with another man, but she was unable to recall what she did on December 22 or December 24, 1982. These were fair questions for the prosecutor to ask this witness, who testified with great confidence about her recollection of that event. Again, as the People correctly point out, the same question probably would have been posed to her had trial occurred in 1984, or any year thereafter. This witness also testified that she described the man she saw with the victim in great detail to the Mojave County Sheriff detective in January 1983, and he testified that she came forward with confidential information at that time, and based on that information, he made a composite sketch. She also testified that she had never before seen the victim with anyone other than defendant and that helped jog her memory of the event. All in all, the certitude with which this witness stated that it was the victim she saw in her bar on December 23, 1982 was not significantly undermined by the fact that so much time had passed between then and the trial.

As to the reason for the delay, the People asserted in their moving papers that they did not have sufficient evidence to charge defendant until 2010, when the case was reviewed, the case agent conducted further interviews, including a new one with

34

defendant, and found people that had not been interviewed during the 1982-1983 investigation. Defendant offered no evidence at the hearing on the motion to dismiss to contradict this. The trial court found that there was no evidence of an intentional or deliberate delay to gain a tactical advantage, no evidence of negligence on the part of the prosecutor and whatever prejudice defendant suffered was outweighed by the justification for the delay. Defendant points to no evidence that undermines the factual findings, which we are obliged to accept if supported by substantial evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 431.) Defendant concedes that such matters are relevant to the balancing process and "justification for the delay is strong when there is 'investigative delay, nothing else.' [Citation.]" (*Ibid.*) However, as we have already concluded, the prejudice to defendant *that he could not have avoided* was so minimal that, in our view, little to no justification was required. Certainly, defendant has presented no basis upon which we may determine that the trial court abused its discretion in denying the motion to dismiss.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

McKINSTER _____
J.

CODRINGTON _____
J.

35